**AD/SAT, A DIVISION OF SKYLIGHT, INC., Plaintiff–Appellant,**

v.

**ASSOCIATED PRESS, Newspaper Association of America, National Newspaper Network, The Newark Star Ledger, The Birmingham News Company, Advance Publications, Inc., Donald E. Newhouse, The Oakland Press Co., The News & Observer Publishing Company, Oklahoma Publishing Company, The Lexington Herald–leader, Dayton Newspapers, Inc., and Cox Enterprises, Inc., Defendants–Appellees.**

**Docket No. 96–7304.**

United States Court of Appeals, Second Circuit.

Argued: Dec. 5, 1996.

Decided: June 23, 1999.

---

Daniel R. Shulman, Minneapolis, Minn., Joseph M. Alioto, San Francisco, Cal. (Terry M. Walcott, Shulman, Walcott & Shulman, Minneapolis, Minn.; David E. Nachman, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York, N.Y., on the brief), for plaintiff-appellant.

Dennis J. Drebsky, New York, N.Y. (Richard N. Winfield, Hilary Lane, John A. Nathanson, Gregory G. Marshall, Rogers & Wells, New York, N.Y., on the brief), for defendant-appellee Associated Press.

Yvonne S. Quinn, New York, N.Y. (Timothy J. Helwick, Andrew Rotstein, Sullivan & Cromwell, New York, N.Y., on the brief), for defendants-appellees Newark Morning Ledger Co., The Birmingham News Company, Advance Publications, Inc., and Donald E. Newhouse.

Conrad M. Shumadine, Norfolk, Va. (Frank A. Edgar, Jr., Willcox & Savage, Norfolk, Va., on the brief), for defendant-appellee The News & Observer Publishing Company.

Patricia Farren, Matthew S. Wild, Cahill Gordon & Reindel, New York, N.Y., submitted a brief for defendants-appellees Newspaper Association of America and National Newspaper Network.

James A. Treanor, III, Timothy J. O'Rourke, Scott D. Dailard, Dow, Lohnes & Albertson, Washington, D.C., submitted a brief for defendants-appellees Dayton Newspapers, Inc. and Cox Enterprises, Inc.

A. Douglas Melamed, James W. Lowe, Wilmer, Cutler & Pickering, Washington, D.C., submitted a brief for defendant-appellee The Oakland Press Company.

. Robert P. Reznick, James B. Kobak, Jr., Hughes Hubbard & Reed, New York, N.Y., submitted a brief for defendant-appellee Lexington Herald–Leader.

Thomas J. Lilly, Lilly & Bienstock, Garden City, N.Y., submitted a brief for defendant-appellee Oklahoma Publishing Company.

Before: WINTER, Chief Judge, NEWMAN, and WALKER, Circuit Judges.

PER CURIAM:

This case involves allegations of anticompetitive conduct in the market for delivery of advertisements to newspapers. The plaintiff-appellant, AD/SAT, was engaged in the business of electronically transmitting advertisements to newspapers from the mid–1980s until 1996. After the Associated Press ("AP") launched a similar service in 1994, AD/SAT accused the AP of violating section 2 of the Sherman Act, 15 U.S.C. § 2, by (i) attempting to monopolize the alleged market for the electronic transmission of advertisements to newspapers; (ii) engaging in monopoly leveraging; and (iii) monopolizing the wire services news and photo transmission markets. In addition, AD/SAT alleged that all the defendants in this case (i) conspired to boycott AD/SAT, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; and (ii) conspired to monopolize the alleged

market of electronic transmission of advertisements to newspapers, in violation of section 2 of the Sherman Act. AD/SAT appeals from the March 6, 1996, judgment of the District Court for the Southern District of New York (Peter K. Leisure, District Judge), to the extent it (i) dismissed AD/SAT's attempted monopolization and monopoly leveraging claims against the AP and its conspiracy claims against the AP and the other defendants, and (ii) declined to reconsider the District Court's April 24, 1995, decision dismissing AD/SAT's claims against the *Lexington Herald–Leader*. *See AD/SAT v. Associated Press*, 920 F.Supp. 1287 (S.D.N.Y.1996) (*"AD/SAT II"*).

We affirm the judgment of the District Court in all respects. AD/SAT's claim that the AP attempted to monopolize the market of advertising delivery cannot survive summary judgment because there is insufficient evidence to create a genuine issue of material fact as to the existence of a dangerous probability that the AP will achieve monopoly power in the relevant product market. Likewise, AD/SAT's monopoly leveraging claim was properly dismissed because AD/SAT has not presented evidence that could support a finding of tangible harm to competition in the advertising delivery market, an essential element of that claim. Finally, we conclude that AD/SAT's allegations of conspiracy are insufficient to withstand the scrutiny prescribed by the Supreme Court in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

### Background

*Overview.* Historically, advertisers and advertising agencies have sent their ads to newspapers by means of physical delivery, such as the postal service, messengers, or overnight delivery services. With these services, advertisers typically bear the cost of delivery. In 1996, when the defendants' motions for summary judgment were decided, over 80 percent of all newspaper ads were delivered by overnight couriers such as Federal Express.

An alternative to physical delivery available to advertisers is electronic delivery. This involves the transmission of copy to newspapers via satellite, land-based lines, or both. From 1986 until 1996, AD/SAT, a division of Skylight, Inc., was engaged exclusively in the electronic delivery of advertisements to newspapers. In providing its transmission services, AD/SAT delivered ads to newspapers over a satellite network owned and operated by the AP. The AP, a cooperative association whose members consist of more than 1,500 United States newspapers, is engaged primarily in the collection and distribution of news and photographs to newspapers. In 1994, the AP launched AdSEND, which delivers ads to newspapers via the AP's satellite network. Unlike physical carriers, such as Federal Express, which offer delivery services for a wide variety of goods, AD/SAT and AdSEND focused their services exclusively on the delivery of ads to newspapers. In this action, AD/SAT argues that the AP's conduct upon its entrance into the ad delivery business, as well as the allegedly unlawful assistance of the remaining defendants, violated sections 1 and 2 of the Sherman Act.

*The parties.* In addition to the AP, the other defendants named by AD/SAT include the Newspaper Association of America ("NAA"), the Newspaper National Network (sued herein as the National Newspaper Network) ("NNN"), several newspapers or groups of newspapers that are member-owners of the AP and members of the NAA, and one individual, Donald Newhouse. The NAA is a non-profit trade association whose members consist primarily of general circulation daily newspapers in the United States. Its mission is to promote the newspaper industry, in part by encouraging the development of technological and marketing innovations that will enhance the efficiency and profit-

ability of newspapers. Formed in the spring of 1994, the NNN is a limited partnership organized by the NAA and forty-eight NAA member-newspapers to promote the use of newspapers as an effective medium for national advertising. The newspaper partners of the NNN consist of forty-eight of the fifty largest newspapers by circulation in the United States. In an attempt to overcome the perception that newspaper advertising is inefficient and cumbersome relative to advertising in other media, such as television and radio, the NNN established a clearinghouse for processing multi-newspaper insertion orders. That service, which is aimed at attracting new advertisers to the newspaper medium and making it as easy as possible for advertisers to place ads in numerous papers, is called the "one order/one bill" service.

Defendant Advance Publications, Inc. ("Advance") is owned by the Newhouse family. Defendant Donald Newhouse, the president of Advance, was, during times relevant to this litigation, a member of the board of directors of the AP and the volunteer chairman of the NAA. Through wholly owned subsidiaries, Advance owns defendants Newark Morning Ledger Co., which publishes the *Star–Ledger*, and Birmingham News Company, which publishes the *Birmingham News*.

Cox Newspapers, Inc., a wholly-owned subsidiary of defendant Cox Enterprises, Inc. ("CEI"), publishes fourteen newspapers of general circulation, including the *Dayton Daily News*, which is owned by defendant Dayton Newspapers, Inc. ("DNI"). David Easterly, the president of CEI, was a member of the AP board of directors and sat on an *ad hoc* committee of the AP board that assisted the AP's management in investigating and planning its entry into the ad delivery market.

Defendant Oklahoma Publishing Company publishes an independent daily newspaper called the *Daily Oklahoman.* De-

fendant News & Observer Publishing Company publishes the *News & Observer.* Defendant Oakland Press Company publishes *The Oakland Press.* Finally, defendant Lexington Herald–Leader, a wholly-owned subsidiary of Knight–Ridder, Inc., publishes *The Herald–Leader.*[1]

*The AD/SAT system.* AD/SAT's electronic delivery system allowed the advertiser to deliver a single hard copy of its ad to one of AD/SAT's two transmittal stations, located in New York and Los Angeles. The ad would then be scanned into AD/SAT's system, and transmitted to designated newspapers via the AP-owned-and-operated satellite network. The ad would be received at each newspaper by an AP satellite dish, and then forwarded to a "recorder" installed and owned by AD/SAT. The recorder would then produce a hard copy of the ad. The recorders—essentially high speed facsimile machines—cost over $60,000 each, and required an additional $30,000 worth of equipment to be operational.

Under this system, AD/SAT generated revenue from annual affiliation fees paid by the newspapers and service fees charged to both the newspapers and the advertisers. Newspapers that joined the AD/SAT network before 1988 paid an annual affiliation fee of $7,500, while newspapers joining after that date paid an annual fee of between $4,500 and $12,500. Depending on the newspaper's affiliation agreement, newspapers paid either a flat reception fee of $28 per ad, or $25 for national ads and $20 for retail ads. Certain newspaper affiliates were not charged reception fees for retail ads. In 1994, forty-eight of the fifty largest papers in the United States were AD/SAT affiliates; of the next one hundred largest papers, sixty were AD/SAT affiliates.

In addition to the fees paid by newspapers, advertisers were charged a transmis-

---

**1.** *The Baltimore Sun* was also named as a defendant, but pursuant to a joint motion of *The Sun* and AD/SAT, the District Court dismissed AD/SAT's claims against *The Sun* with prejudice in May 1995.

sion fee, with the price decreasing as the number of sites to which the ad was being sent increased.[2] Because the cost of sending a distinct ad to a single location over the AD/SAT network was much higher than the cost of physical delivery, the system was cost-effective only for those advertisers who sent an identical ad to many different locations. For this reason, AD/SAT targeted national advertisers.

Though AD/SAT delivered more ads electronically than any other supplier of delivery services, it delivered only a small percentage of all ads placed in newspapers. AD/SAT found expansion of its network difficult, due in large part to the high fees necessary to cover the fixed costs associated with the recorders, as well as the annual fee of $730,000 which AD/SAT paid to the AP for use of its satellite network. As early as 1990, AD/SAT recognized that the high costs associated with its system would preclude growth. At that time, AD/SAT's then-president, Richard Atkins, decided to stop acquiring recorders, and pursue converting the AD/SAT system into a digital network, which would allow newspapers to use much less expensive computers rather than the recorders to receive advertisements. However, as a result of financial difficulties, AD/SAT's transition to digital technology was extremely slow. Although it developed a digital delivery system sometime in 1991, it had installed digital reception equipment at less than fifteen newspapers by 1994.

In March of 1994, Skylight, Inc. purchased AD/SAT for approximately $4.1 million dollars, including the assumption of certain liabilities. The new management recognized the existing problems with the business, and had plans to revitalize and expand AD/SAT's business, which, they assert, would have been successful but for the actions of the AP and the other defendants.

*The AP's development of AdSEND.* The AP began to consider entering the business of electronic delivery of ads to newspapers as early as 1991. At that point, the AP had recently introduced PhotoStream, a high speed, satellite-based delivery system for the transmission of photographs to newspapers. The AP saw electronic delivery of advertisements as a natural extension of this business. The AP's approach, however, was quite different from AD/SAT's. From the beginning, the AP believed that it needed to price its services at levels competitive with the prices charged by the overnight delivery services that dominated the delivery market. Furthermore, the AP installed reception equipment at the newspapers free of charge and allowed member-newspapers to receive advertisements without any charge. Thus, unlike AD/SAT's pricing structure, advertisers bear the entire cost of using AdSEND, just as they do when using traditional physical delivery services.

AdSEND allows advertisers to transmit ads from their own computers to newspapers' computers in digital form, via a hub in New Jersey. At the hub, a central computer checks to ensure that no transmission error has occurred and then sends the ad to the designated newspapers. No hard copy of the ad is created until the ad is downloaded to the newspapers' imaging equipment; thus, the ad arrives at the newspaper as a first generation image.

As the AP researched its new venture, it sought and received assistance from the NAA, which has extensive knowledge about the newspaper advertising market. Newhouse, volunteer chairman of the NAA, president of Advance, and also an AP board member, was the AP's primary contact at the NAA. Before AdSEND was announced publicly, NAA officials, at New-

---

2. Under the rate card effective from August 1991 to 1994, the fee for an advertiser sending a single ad to a single paper on the same day was $90. The lowest price per transmission was $11.70, which applied if the adver-tiser sent the ad to 76 or more newspapers. In its last years of operation, however, AD/SAT often negotiated special rates for its larger customers.

house's request, met with AP officials to discuss the project. These meetings led the NAA to support the AP's efforts. After AdSEND's announcement, the NAA allowed the AP to give presentations on AdSEND at NAA-sponsored conferences that focused on the "one order/one bill" project, and one NAA employee stated that it would have been reasonable for industry members to have the impression that the NAA endorsed AdSEND at these meetings. This relationship between the AP, Newhouse, and the NAA is at the heart of AD/SAT's conspiracy claims.

The AdSEND business plan was approved by the AP board and announced to the public in April 1994. During times relevant to this lawsuit, AD/SAT and the AP were not the only companies that offered electronic delivery services. Other companies offering similar services included DigiFlex, Ad eXpress, AdStar, AdLink, and Business Link.

*District Court proceedings.* In September 1994, AD/SAT filed its complaint. The Court denied AD/SAT's application for a preliminary injunction barring the AP and those in active concert with it from initiating or participating in the AdSEND program. The Court concluded that AD/SAT had failed to make the requisite showing of likelihood of success on the merits. *See AD/SAT II*, 920 F.Supp. at 1295 (recounting 1994 preliminary injunction ruling).

In November 1994, AD/SAT filed an amended complaint, alleging that the AP had violated section 2 of the Sherman Act by (i) attempting to monopolize the alleged market for the electronic transmission of advertisements to newspapers; (ii) engaging in monopoly leveraging; and (iii) monopolizing the wire services news and photo transmission markets. In addition, AD/SAT alleged that the AP, NAA, NNN, Newhouse, and the newspaper defendants had engaged in conspiracies to boycott AD/SAT, in violation of section 1 of the Sherman Act, and to monopolize the alleged market for the electronic transmission of advertisements to newspapers, in

violation of section 2 of the Sherman Act. The parties proceeded to conduct extensive discovery, taking more than 70 depositions and exchanging approximately 40,000 pages of documents.

In December 1994, one of the newspaper defendants, the *Lexington Herald–Leader*, moved for judgment on the pleadings or, in the alternative, summary judgment. The District Court granted the motion in April 1995, dismissing AD/SAT's conspiracy claims against the *Lexington Herald–Leader*. *See AD/SAT v. Associated Press*, 885 F.Supp. 511 (S.D.N.Y.1995) ("*AD/SAT I*"). The District Court held that AD/SAT failed to state a claim against the *Lexington Herald–Leader* for conspiracy to monopolize because it had not alleged facts from which the necessary element of a specific intent to monopolize could be inferred. Accordingly, the Court dismissed the section 2 claim against the *Herald–Leader* on the pleadings. *See id.* at 516.

With respect to AD/SAT's claim that the *Herald–Leader* violated section 1 by conspiring with the other defendants to boycott AD/SAT, the Court ruled that AD/SAT's pleadings were sufficient to withstand a motion to dismiss. Applying the standard articulated by the Supreme Court in *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348, however, the Court held that summary judgment was appropriate because AD/SAT had failed to present evidence that tended to exclude the possibility that the *Lexington Herald–Leader* was acting independently when it terminated its relationship with AD/SAT. *See AD/SAT I*, 885 F.Supp. at 519–21. Specifically, the Court found that there was no evidence suggesting that the *Lexington Herald–Leader* had ever agreed with any other newspaper or the AP on any course of conduct with regard to AD/SAT; furthermore, the Court concluded that AD/SAT had not presented any evidence to undermine the *Lexington Herald–Leader*'s explanation that "economic compulsions ... constrained it to suspend its association with AD/SAT." *Id.* at 519.

Accordingly, the Court granted summary judgment, dismissing AD/SAT's remaining claim against the *Lexington Herald–Leader*.

In May 1995, the AP and the other remaining defendants moved for summary judgment. The District Court granted the motion and dismissed the rest of AD/SAT's claims in their entirety. *See AD/SAT II*, 920 F.Supp. 1287. In considering AD/SAT's attempted monopolization claim against the AP, the Court concluded that the relevant product market was the delivery of advertising to newspapers by any means, including physical delivery. *See id.* at 1296–99. As is frequently the case in antitrust litigation, the Court's definition of the relevant market was dispositive. Defining the market so broadly meant that AD/SAT could not show that there was a dangerous probability that the AP would achieve monopoly power—one of the essential elements of an attempted monopolization claim. *See id.* at 1299–1300. The Court also found that AD/SAT's claims that AdSEND was prematurely announced and that it was predatorily priced were not supported by any evidence in the record. *See id.* at 1301–04. Accordingly, the Court dismissed AD/SAT's claim of attempted monopolization.

The District Court also found that AD/SAT's monopoly leveraging claim could not survive summary judgment. The Court expressed skepticism about the applicability of such a claim in the absence of allegations of product "tying." *See id.* at 1304–05. Furthermore, the Court found that AD/SAT's allegations of leveraging were either not supported by any evidence in the record or that the challenged conduct did not depend on the AP's having a monopoly in either the wire services news or photo transmission markets. *See id.* at 1305–06. Rather, the Court concluded that the challenged conduct demonstrated that the AP was taking advantage of its resources and good will in a manner wholly consistent with lawful business development. *See id.* Accordingly, the Court granted summary judgment in favor of the AP on this claim.

With respect to AD/SAT's claim of unlawful monopolization of the wire services news and photo transmission markets, the District Court found that AD/SAT lacked standing to assert this claim because it was neither a customer nor a competitor of the AP in either of these markets. *See id.* at 1306–07.

The Court then considered AD/SAT's conspiracy claims. Turning first to AD/SAT's threshold arguments regarding concerted action, the Court rejected AD/SAT's argument that the AP was collaterally estopped by the Supreme Court's decision in *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), from denying that every action it takes is the concerted action of its members. The District Court was also not persuaded by AD/SAT's argument that trade associations, such as the AP, are continuing conspiracies of their members as a matter of law, reasoning that the cases cited by AD/SAT were inapposite and that the caselaw of this Circuit requires that "AD/SAT must establish a conspiracy . . . by proving the existence of an agreement." *AD/SAT II*, 920 F.Supp. at 1308.

The District Court then examined the evidence submitted by AD/SAT pertaining to each defendant to determine whether a reasonable juror could find that there was concerted action between two or more legally distinct defendants. Guided by the Supreme Court's holding in *Matsushita*, the District Court considered whether the defendants, other than the AP, had any rational motive to join a conspiracy to destroy competition in the market for delivery of advertisements. *See id.* at 1309–10; 1315–16. Finding that they did not, the Court proceeded to determine whether a reasonable inference of conspiracy could be drawn from the conduct challenged by AD/SAT. The Court concluded that the defendants' conduct was as consistent with their independent business interests as

with an unlawful conspiracy and, therefore, granted summary judgment in favor of the defendants (other than the AP) because AD/SAT had failed to proffer any evidence tending to exclude the possibility that they had acted independently. *See id.* at 1309–18. Having granted summary judgment on the conspiracy claims to all other defendants, the Court also dismissed AD/SAT's conspiracy claims against the AP. *See id.* at 1318.

AD/SAT appeals from the District Court's rulings dismissing its conspiracy claims against all defendants and its claims of attempted monopolization and monopoly leveraging by the AP.

## Discussion

### I. Denial of Oral Argument on Summary Judgment Motion

■ As a threshold matter, AD/SAT argues that it was reversible error for the District Court to grant summary judgment in favor of the defendants without permitting oral argument. We have held that a district court's decision whether to permit oral argument rests within its discretion. *See Katz v. Morgenthau,* 892 F.2d 20, 22 (2d Cir.1989). Although AD/SAT argues that oral argument should have been permitted given the complexity of the issues, it presents no basis for concluding that resolving the summary judgment motion solely on the basis of the extensive record and the elaborate motion papers exceeded the District Court's discretion.

In support of its argument, AD/SAT relies on the decision of the Ninth Circuit Court of Appeals in *Dredge Corp. v. Penny,* 338 F.2d 456, 461–62 (9th Cir.1964), which held that a court may not deny a request for oral argument on a motion for summary judgment unless the court intends to rule in favor of the party requesting argument. This Court, however, has never adopted such a rule. Moreover, even the Ninth Circuit requires that a party seeking to reverse a summary judgment order must demonstrate that it was

prejudiced by the court's refusal to hear argument. *See Partridge v. Reich,* 141 F.3d 920, 926 (9th Cir.1998). AD/SAT has made no showing of prejudice.

### II. Attempted Monopolization Claim

■ We turn first to AD/SAT's claim that the AP attempted to monopolize the market for delivery of advertisements to newspapers. To survive a motion for summary judgment dismissing this claim, AD/SAT was required to demonstrate triable issues of fact as to whether the AP (1) engaged in anticompetitive or predatory conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir.1990). As we have previously noted, "A threshold showing for a successful attempted monopolization claim is sufficient market share by the defendant" because a defendant's market share is "the primary indicator of the existence of a dangerous probability of success." *Twin Laboratories,* 900 F.2d at 570 (citation omitted); *see also United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) ("The existence of [monopoly power] ordinarily may be inferred from the predominant share of the market.").

■ In order to ascertain the market share of AP's AdSEND, we first must define the relevant product and geographic markets. *See Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). Once the relevant market is determined, we consider a variety of factors in addition to the defendant's market share, including the strength of competition, barriers to entry, and the probable development of the market, *see International Distribution Centers, Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 792 (2d Cir. 1987), in order to determine whether there is a dangerous probability that, left un-

checked, the defendant will attain monopoly power, *i.e.*, the ability "(1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion." 2A Phillip E. Areeda *et al.*, *Antitrust Law* ¶ 501, at 86 (emphasis in original) [hereinafter "Areeda"].

■ The parties agree that the relevant geographic market is the United States. Based on its finding that physical and electronic delivery services are reasonably interchangeable, the District Court concluded that the relevant product market is the market for delivery of advertisements to newspapers by any means. *See AD/SAT II*, 920 F.Supp. at 1297–1300. AD/SAT asserts that this definition of the market is too broad and urges us to limit the relevant market to the market for electronic delivery of advertisements, in particular the "rush," three-hour electronic delivery market. At the very least, AD/SAT argues, a triable issue of fact regarding the definition of the relevant product market exists.

■ The relevant market for purposes of antitrust litigation is the "area of effective competition" within which the defendant operates. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–28, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). As the Court explained in *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956):

> The "market" which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.

*Id.* at 404, 76 S.Ct. 994. Thus, products or services need not be identical to be part of the same market. *See id.* at 394, 76 S.Ct. 994 ("[W]here there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others."). In economists' terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product. *Cf. Grinnell*, 384 U.S. at 571, 86 S.Ct. 1698. Also relevant to the delineation of a relevant product market is cross-elasticity of supply, which depends on the extent to which producers of one product would be willing to shift their resources to producing another product in response to an increase in the price of the other product. *See* 2A Areeda ¶ 536, at 195. Where there is cross-elasticity of supply, a would-be monopolist's attempt to charge supracompetitive prices will be thwarted by the existence of firms willing to shift resources to producing the product, thereby increasing supply and driving prices back to competitive levels. *See id.; see also id.* ¶ 423, at 77–78.

In its First Amended Complaint, AD/SAT stated that "the transmission of advertising to newspapers" was a "relevant product market for purposes of this action." First Amended Complaint ¶ 21. Although it predicted that electronic transmission of advertisements—via satellite, land links, or both—would become the predominant mode of transmission in the future, AD/SAT noted that "[a]t present, advertisers use several means to transmit their ads to newspapers[,]" citing, as the most common, "delivery through the mail, courier service, overnight delivery service, such as Federal Express, and similar physical delivery services." *Id.* AD/SAT's president, David Hilton, stated in deposition testimony that AD/SAT's competitors included companies that offer physical delivery services, as well as companies that offer electronic transmission services. Likewise, Bain & Company, a management consulting firm retained by AD/SAT, concluded that because most de-

liveries of ads to newspapers are not urgent, AD/SAT needed to price its service at levels competitive with overnight delivery services, which accounted for approximately 80 percent of all deliveries to newspapers.

Recognition of the broad scope of the market within which AD/SAT competed helps to explain why the company was not highly successful. Due to the high cost of its service, AD/SAT captured only a small segment of the relevant market: certain advertisers who periodically required emergency rush service. Unlike AD/SAT, the AP understood from the beginning that it needed to price AdSEND's services to compete with physical carriers. Indeed, it listed as a "key success factor" that AdSEND "must be *cost-effective*, even to advertisers that mail their ads to newspapers." Plaintiff's Ex. 7 at 15 (emphasis in original). Thus, it is beyond dispute that both AD/SAT and the AP considered physical carriers, such as Federal Express, to be their competitors.

Despite the abundance of evidence demonstrating that physical carriers competed with electronic delivery services for advertisers' business, AD/SAT argues that electronic delivery services—especially rush, three-hour, services—constitute a distinct product market. AD/SAT points out that, despite the greater expense, advertisers continued to use its service for rush deliveries and that AP's AdSEND has a dual pricing structure ($8 for overnight transmission; $40 for one-hour transmission). Based on these facts, AD/SAT argues that persisting demand for the higher-priced electronic transmission service, despite the availability of lower-priced alternatives, demonstrates that the two services are not reasonably interchangeable and, thus, do not compete in the same market.

It is true that one hallmark of reasonable interchangeability between two particular goods is uniformity in price. *See* 2A Areeda ¶ 530a, at 150. The Supreme Court recognized the relevance of price differences to the definition of a relevant market in *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). However, significant price differences do not always indicate distinct markets. *See* 2A Areeda ¶ 562c, at 262 ("Products can be near-perfect substitutes even when their prices or qualities differ."). In this case, we are not persuaded that the difference in prices for rush electronic and non-rush delivery services indicates that distinct markets for these services exist. As the Areeda treatise notes, antitrust law is concerned only with "substantial" market power. Thus, where a "market" itself is insubstantial, made up of only a few buyers with extremely strong preferences, antitrust law is not implicated. *See id.* ¶ 530e, at 155 ("Most courts implicitly insist that a market be 'substantial' in scope by ignoring smaller ones.").

Moreover, AD/SAT's experience reveals that the market for rush electronic delivery of advertisements to newspapers is not a viable one. According to AD/SAT's own marketing consultants, the rush delivery market was a "very narrow segment" of the newspaper advertising delivery market. These same consultants concluded that AD/SAT needed to reposition itself by moving away from its image as a last-resort emergency service in order to survive. The evidence showed, beyond reasonable dispute, that the few customers AD/SAT was able to attract for its rush services indicated not the existence of a distinct market but the constraint AD/SAT encountered in expanding its business because of the availability of physical carriers.

It is important to remember that "[a] 'market' is any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, *could profitably raise prices* significantly above the competitive level. If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market." 2A Areeda ¶ 533, at 169 (emphasis added). Here, the evidence before the District Court indicated

that if the providers of electronic delivery services formed a cartel and charged supracompetitive prices for their "rush" services, a sufficient number of their customers would shift to other carriers or to non-rush electronic delivery, that the hypothetical cartel's price increase would not prove profitable. Under such circumstances, there is significant cross-elasticity of demand for rush and non-rush delivery services, and the two services are part of the same market. Accordingly, the District Court properly found the relevant product market to be the market for delivery of advertisements to newspapers by any means.

■ With the relevant product market thus defined, it is clear that AdSEND's market share is not sufficient to support an attempted monopolization claim. As AD/SAT's own research revealed, during the time relevant to this action, over 80 percent of all ads were delivered to newspapers by overnight carriers. Even if AdSEND managed to capture the rest of the market, such a market share would not be cause for concern. Indeed, we have held that a 33 percent market share does not approach the level required for a showing of dangerous probability of monopoly power. *See Nifty Foods Corp. v. Great Atlantic and Pacific Tea Co.,* 614 F.2d 832, 841 (2d Cir.1980); *see also* Thomas V. Vakerics, *Antitrust Basics,* § 5.03, at 5–23 ("It would appear rather difficult to establish the dangerous probability element where a defendant holds less than a 40% share of a market, unless other factors indicate the market share figures understate the market power held by the defendant.").

Furthermore, we agree with the District Court that "[i]t is simply implausible to think that the development and implementation of AP['s] AdSEND could drive these competitors [the overnight delivery services] out of the ad delivery business." *AD/SAT II,* 920 F.Supp. at 1299. As the District Court noted, even if AdSEND became the dominant method of delivering ads to newspapers, overnight carriers could quickly and easily reenter the market in the event that AdSEND attempted to charge supracompetitive prices. *See id.; see also* 2A Areeda ¶ 506d, at 103 ("[T]ransitory power may safely be ignored by antitrust law. The social costs of antitrust intervention (including its error potential) are likely to exceed the gains when market forces themselves would bring the defendant's power to an end fairly quickly.").

Even if we were to recognize a relevant product sub-market limited to the electronic transmission of advertisements, that sub-market would be characterized by rapid technological development and low barriers to entry. *See Walsh Trucking,* 812 F.2d at 792 (noting that, among other things, barriers to entry and probable development of the market are relevant to determination of whether there is a dangerous probability that the defendant will achieve monopoly power). Indeed, AD/SAT itself noted that "[a]t present, the market for the transmission of newspaper advertising, as well as the electronic transmission submarket thereof, is characterized by low concentration, vigorous competition, rapid technological development, and ease of entry...." Amended Complaint ¶ 23. AD/SAT's marketing consultants likewise were aware of the threat of new entrants. *See* Deposition of Sam Rovit at 133 ("[B]ecause of the technology, eventually you would probably find other people coming in."). Indeed, from its inception, AdSEND faced competition from several companies, in addition to AD/SAT, that provided electronic transmission services.

In summary, AP's AdSEND enjoys only a small share of the relevant product market. Competition within that market is substantial. Rapidly developing technology for the transmission of data and low barriers to market entry suggest that the AP will face significant competition from new entrants. In the face of these facts, AD/SAT cannot prove an essential element of its attempted monopolization claim—

that there is a dangerous probability that AP's AdSEND will achieve monopoly power. We need not consider whether AD/SAT presented triable issues of fact with respect to the remaining elements of an attempted monopolization claim—predatory conduct and specific intent to monopolize. The District Court properly granted summary judgment in favor of the AP on this claim.

### III. Monopoly Leveraging Claim

AD/SAT also contends that the AP leveraged its monopoly power in the wire services news and photograph transmission markets to gain an unlawful advantage in the market for delivery of newspaper advertisements, in violation of section 2 of the Sherman Act. Whatever the continued scope of monopoly leveraging claims as independent causes of action, *cf. Spectrum Sports*, 506 U.S. at 459, 113 S.Ct. 884 ("[Section] 2 makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so.") (citation omitted), it is clear that AD/SAT has not presented evidence to support such a claim in this case.

We have said that a "successful claim of monopoly leveraging requires proof of at least three factors: monopoly power in one market, the use of [that] power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor in another distinct market, and injury caused by the challenged conduct." *Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 681 (2d Cir.1985) (internal citations and quotation marks omitted). This Court first recognized monopoly leveraging as a distinct cause of action under section 2 of the Sherman Act in *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), where we stated, in dictum, that "the use of monopoly power attained in one market to gain a competitive advantage in another is a violation of § 2, even if there has not been an attempt to monopolize the second market." *Id.* at 276.

■■ Although a plaintiff alleging monopoly leveraging is not required to demonstrate a substantial market share by the defendant, application of the doctrine is limited to those circumstances where the challenged conduct actually injures competition, not just competitors, in the second, non-monopolized market. *See Twin Laboratories*, 900 F.2d at 571 (noting that a monopoly leveraging claim requires "tangible harm to competition"); *cf. Spectrum Sports*, 506 U.S. at 459, 113 S.Ct. 884 ("The concern that § 2 might be applied so as to further anticompetitive ends is plainly not met by inquiring only whether the defendant has engaged in 'unfair' or 'predatory' tactics."). As Professors Areeda and Hovenkamp explain, a claim for monopoly leveraging is properly stated only where the plaintiff can demonstrate that the challenged conduct "threatens the [second] market with the higher prices or reduced output or quality associated with the kind of monopoly that is ordinarily accompanied by a large market share." 3 Areeda ¶ 652, at 90. Thus,

> a large firm does not violate § 2 simply by reaping the competitive rewards attributable to its efficient size, nor does an integrated business offend the Sherman Act whenever one of its departments benefits from association with a division possessing a monopoly in its own market. So long as we allow a firm to compete in several fields, we must expect it to seek the competitive advantages of its broad-based activity—more efficient production, greater ability to develop complementary products, reduced transaction costs, and so forth. These are gains that accrue to any integrated firm, regardless of its market share, and they cannot by themselves be considered uses of monopoly power.

*Berkey Photo*, 603 F.2d at 276.

■ Here, the AP conceded for purposes of its motion for summary judgment that it has monopoly power in the market for wire services, and that PhotoStream,

AP's service for the electronic transmission of photographs to newspapers, enjoys monopoly power in the market for that service. AD/SAT contends that the AP caused tangible harm to competition in the ad delivery market by leveraging these monopolies in the following ways: (i) subsidizing the cost of AdSEND reception equipment through member-owner assessments; (ii) charging AD/SAT monopoly prices for the use of AP's satellite network; (iii) prematurely announcing AdSEND in order to deter potential competitors; (iv) premising its marketing approach to advertisers on AdSEND's ability to offer access to all United States newspapers via AP's preexisting satellite network; (v) using its bureau and communications chiefs and news and photo division employees to solicit customers for AdSEND; (vi) marketing AdSEND to member newspapers by trading on their interest as owners of the AP and, ultimately, AdSEND; (vii) combining with member-owner newspapers to solicit advertisers and encourage them not to use competitors' services; and (viii) soliciting and obtaining agreements from member-owner newspapers not to deal with competitors. These last three examples of allegedly predatory conduct are merely restatements of AD/SAT's conspiracy claims and are considered below in our discussion of those claims.

Turning to AD/SAT's other leveraging allegations, we note that there is no evidence that the AP conditioned the use of PhotoStream or its wire service on the use of AdSEND. In *Twin Laboratories*, we expressed some skepticism about the viability of a monopoly leveraging claim in the absence of an allegation of tying. *See* 900 F.2d at 570–71. Furthermore, much of the conduct AD/SAT challenges is the very sort of activity *Berkey Photo* cautions against deterring, much less punishing. *See* 603 F.2d at 276. That is, it is not unlawful for an existing firm, entering a new product market, to promote its product by touting the benefits afforded by that product's association with the firm.

Nor is it unlawful for employees of one division of a firm to promote products produced by another division. As the District Court found, such conduct is the sort of "normal business development which is to be expected by any competitor entering a new business." *AD/SAT II*, 920 F.Supp. at 1305–06.

Furthermore, AD/SAT has not presented any evidence to support its claim that the AP announced AdSEND prematurely. When publicly announcing AdSEND in April 1994, the AP stated that the program would be tested over the summer and launched in September. Testing was done over the summer and, while some glitches remained in the system throughout the fall of 1994, it was operational shortly after the time the AP had projected. Moreover, "pre-announcement" of a new product constitutes predatory conduct only when it is knowingly false. *See MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1128 (7th Cir. 1983). There is no suggestion that the AP's announcement of AdSEND was knowingly false.

With respect to AD/SAT's claim that the AP subsidized the cost of reception equipment with member-owner assessments, we note that AdSEND retains title to the reception equipment it places with newspapers. Furthermore, the costs of launching AdSEND, including the costs associated with reception equipment, were accounted for in AdSEND's financial projections. Thus, AD/SAT has not submitted evidence that could support a finding of cross-subsidization from other AP activities. Moreover, this allegation has little, if anything, to do with AP's purported monopoly power in the wire services and photo transmission markets. A monopoly leveraging claim is established only where a defendant uses its monopoly power in one market to injure competition in a second market. *See Berkey Photo*, 603 F.2d at 284.

AD/SAT's remaining allegation of predatory conduct is that the AP charged AD/

SAT monopoly prices for its use of the AP satellite network. AD/SAT paid an annual use fee of $730,000, while the AP charged AdSEND only $75,000. Despite this significant disparity in prices, AD/SAT's argument fails for several reasons. First, AD/SAT has not even alleged, much less submitted evidence demonstrating, that the AP has a monopoly in the market for satellite services. Second, the contracts governing AD/SAT's use of the AP satellite network were first entered into in 1986—long before the advent of Ad-SEND—and favorably renegotiated in 1991. Third, there is no evidence that could support the finding that it was necessary for AD/SAT to use the AP satellite network to compete in the market for delivery of advertisements to newspapers. This is not surprising since the relevant product market is the delivery of advertisements to newspapers by any means. And, even if the market were limited to electronic transmission of advertisements, AD/SAT could not demonstrate that use of the AP network was essential to its ability to compete in the market. Other firms offer satellite services, and other modes of electronic transmission, such as land lines, are available.[3]

In any event, the District Court's dismissal of AD/SAT's monopoly leveraging claim was appropriate because AD/SAT did not present evidence that could support a finding of tangible harm to competition, an essential element of the claim. *See Twin Laboratories*, 900 F.2d at 571. Indeed, the evidence submitted reveals that AdSEND's services are priced lower than those of AD/SAT, and that the technology used by AdSEND offers certain advantages over physical delivery and some electronic transmission services. *Cf.* 3 Areeda ¶ 652, at 90 (arguing that monop-

oly leveraging claims should be limited to instances where the challenged conduct "threatens the [second] market with the higher prices or reduced output or quality associated with the kind of monopoly that is ordinarily accompanied by a large market share").

The District Court properly granted summary judgment dismissing AD/SAT's monopoly leveraging claim against the AP.

## IV. Sherman Act Conspiracy Claims

AD/SAT claims that the AP and the remaining defendants—the newspaper defendants, Newhouse, the NAA, and the NNN—unlawfully conspired to boycott AD/SAT, in violation of section 1 of the Sherman Act, and to monopolize the market for delivery of newspaper advertisements, in violation of section 2 of the Sherman Act.

 Section 1 states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is hereby declared to be illegal." 15 U.S.C. § 1. A section 1 boycotting claim requires evidence of an illegal agreement that constitutes an unreasonable restraint of trade, either *per se* or under the rule of reason. *See Capital Imaging Associates v. Mohawk Valley Medical Associates, Inc.*, 996 F.2d 537, 542 (2d Cir.1993). Only after an agreement is established will a court consider whether the agreement constituted an unreasonable restraint of trade. *See id.*

 Section 2 of the Sherman Act prohibits individuals from "combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several

---

**3.** AD/SAT's claim of overcharging is very similar to an "essential facilities" antitrust claim. Thus, it is relevant to note that an "essential facilities" plaintiff must raise a triable issue of fact with respect to whether it is economically infeasible for the facility to be duplicated, and whether the denial of use inflicts a severe handicap. *See Twin Laboratories*, 900 F.2d at

568–69. Assuming that overcharging for the use of a facility is tantamount to denial of use, AD/SAT's claim nevertheless would fail because it has not raised a genuine issue of material fact with respect to whether it was overcharged so as to be effectively denied use or at least severely handicapped.

States. . . ." 15 U.S.C. § 2. A successful conspiracy claim under section 2 requires "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *Walsh Trucking,* 812 F.2d at 795 (internal quotation marks and citations omitted).

 Critical to surviving a motion for summary judgment on these claims is the threshold showing that a reasonable jury could find that the defendants' actions were concerted rather than independent. In *Monsanto,* the Supreme Court held that the inference of concerted action can be drawn only where the plaintiff presents "direct or circumstantial evidence that reasonably tends to prove that [each defendant] had a conscious commitment to a common scheme designed to achieve an unlawful objective." 465 U.S. at 764, 104 S.Ct. 1464 (internal quotation marks and citation omitted). Furthermore, "antitrust law limits the range of permissible inferences from ambiguous evidence." *Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348. Thus, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment . . ., a plaintiff seeking damages . . . must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (citations omitted). Moreover, the absence of a rational motive to engage in the alleged conspiracy is "highly relevant to whether a 'genuine issue for trial' exists within the meaning of Rule 56(e)," *id.* at 596, 106 S.Ct. 1348; if the defendants have "no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy," *id.* at 596–97, 106 S.Ct. 1348 (citation omitted).

 Before examining AD/SAT's allegations against the various defendants, it is necessary to consider two threshold arguments that AD/SAT makes in support of its allegation of concerted action. First, AD/SAT argues that the AP is collaterally estopped from denying that any action taken by it is concerted action by its members, citing the Supreme Court's 1945 decision in *Associated Press,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013. In that case, the Supreme Court found that two AP bylaws, which had the effect of preventing non-AP member newspapers from buying news from the AP or its members and granting each AP member the power to block non-member competitors from becoming members, violated sections 1 and 2 of the Sherman Act. We agree with the District Court that the principle of collateral estoppel does not mandate a finding of concerted action in this case. The issue decided by the Court in *Associated Press* was whether two particular bylaws of the AP constituted a conspiratorial agreement in violation of the antitrust laws. Neither of those bylaws is at issue in this case. *Associated Press* did not determine that AP members are engaged in a conspiratorial agreement with respect to all actions of the AP. The defendants are not precluded from denying concerted action with respect to the allegations levied by AD/SAT.

 Second, AD/SAT contends that, as a matter of *stare decisis, Associated Press* and other decisions finding the conduct of trade associations to be joint action of the association's members dispense with the need to inquire into the existence of a conspiratorial agreement among the members of such associations. In support of this argument, AD/SAT cites this Court's opinion in *Phelps Dodge Refining Corp. v. Federal Trade Commission,* 139 F.2d 393 (2d Cir.1943). There, we stated that "a member [of a trade association] who knows or should know that his association is engaged in an unlawful enterprise [restraining competition] and continues his membership without protest may be charged with complicity as a confederate." *Id.* at 396. The Supreme Court's decisions in *Monsanto* and *Matsushita* call into doubt

the continued viability of *Phelps'* membership-ratification theory as a basis for antitrust conspirator liability. Other courts have held that this doctrine does not retain the force of law. *See Wilk v. American Medical Ass'n,* 671 F.Supp. 1465, 1492 (N.D.Ill.1987), *aff'd,* 895 F.2d 352 (7th Cir. 1990). Furthermore, recent decisions of this Court demonstrate that we require a factual showing that each defendant conspired in violation of the antitrust laws, and have not adopted a "walking conspiracy" theory in place of such a showing. *See Capital Imaging,* 996 F.2d at 544–45 (holding that members of a physicians' practice association had the capacity to conspire among themselves but that "[t]he mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred"); *see also* Vakerics, *supra,* § 6.13, at 6–37 to –38 ("In situations where a trade association, its officers, employees or members are found to have violated the antitrust laws, membership in the association will not automatically involve all members in the violation. There must, instead, be some evidence of actual knowledge of, *and participation in,* the illegal scheme in order to establish a violation of the antitrust laws by a particular association member.") (emphasis added).

Thus, although the nature of trade associations is such that they are frequently the object of antitrust scrutiny, *see Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 500–01, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), every action by a trade association is not concerted action by the association's members. Indeed, the varying roles played by trade associations such as the AP call for careful consideration by courts faced with allegations of antitrust conspiracy. As has been properly noted,

> [t]here seems no conceptual difficulty in treating organizations created to serve their member-competitors or to regulate their market behavior as continuing conspiracies of the members. Nor is there any practical problem when we focus on those improprieties reducing competition among the members or with their competitors. But what about the day-to-day operations of the organization? Must we also see the trade association's buying, selling, hiring, renting, or investing decisions as continuing conspiracies among the members? . . . . [A]ll of these decisions become subject to Sherman Act § 1 litigation if [trade associations] are conspiracies. . . . One might respond to this concern in three ways: ignore it, adjust the necessary allegations or proofs, or hold such organizations continuing conspiracies for some purposes but single entities for other purposes.

7 Areeda ¶ 1477, at 347. To avoid unwarranted regulation of legitimate conduct, Professor Areeda suggested that "[t]o the extent that [trade associations] are buying and selling [products or services] in their own right, they can fairly be regarded as single entities whose selling decisions are not 'price-fixing conspiracies' and whose buying decisions are not 'boycott conspiracies' of rejected suppliers." *Id.* at 348.

Regardless of whether trade associations are ever "continuing conspiracies" of their members, we think it clear in this case that a finding of concerted action based on the defendants' status as members of the AP would seriously undermine the standards articulated by the Supreme Court in *Matsushita* and *Monsanto.* Consistent with those decisions, an antitrust plaintiff must present evidence tending to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective. Accordingly, we must examine the evidence submitted by AD/SAT pertaining to each defendant to determine whether, viewed in the light most favorable to AD/SAT, this evidence could give rise to a reasonable inference of concerted action by the defendants.

The District Court granted the defendants' motions for summary judgment dismissing the conspiracy claims because it found that (i) the other defendants had no rational motive to conspire with the AP to reduce competition in the market for delivery of newspaper advertisements to newspapers and (ii) their conduct was as consistent with the defendants' legitimate business interests as with a conspiracy to monopolize the advertising delivery market or to boycott AD/SAT.

## A. The Newspaper Defendants

AD/SAT contends that the newspaper defendants were motivated to join the AP in a concerted refusal to deal with AD/SAT, and in a conspiracy to monopolize the market for delivery of advertisements, by the desire to benefit from AdSEND's monopoly profits in the form of lower annual dues for AP membership.

Like the District Court, we are not persuaded that the hope for lower AP dues can be said to be a rational motive for joining the conspiracies alleged in this case. We do not doubt that the newspaper defendants would be pleased to have their AP membership fees reduced, or that they may have seen lower fees as a possible fringe benefit of AdSEND. Nevertheless, in view of the importance of advertising revenue to the newspaper industry, we think it highly unlikely that the newspaper defendants would jeopardize that revenue by overcharging advertisers for delivery services in the hope that monopoly profits for such services eventually would lead to lower AP dues. Indeed, it is more likely that the newspaper defendants hoped that AdSEND would increase competition in the advertising delivery market, thereby lowering prices and making the newspaper medium more attractive to advertisers.

■ Allegedly anticompetitive conduct must be considered in its factual context. Where that context reveals that the conspiracy claim is one "that simply makes no economic sense—[the plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. In this case, the factual context of each defendant's decision to terminate, or attempt to terminate, its relationship with AD/SAT strongly suggests that the newspaper defendants had no rational economic motive to join the alleged conspiracies. Furthermore, the challenged conduct of each newspaper defendant is as consistent with the defendant's legitimate, independent business interests as with an illegal combination in restraint of trade. Under these circumstances, AD/SAT was required to submit evidence tending to exclude the possibility that the defendants acted independently. *See Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348; *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 923 (2d Cir.1985) ("An antitrust plaintiff may not, therefore, in opposing a motion for summary judgment, rest on conclusory assertions of conspiracy when the defendants have proffered substantial evidence supporting a plausible and legitimate explanation of their conduct.") (citation omitted). As discussed in detail below, AD/SAT failed to submit such evidence.

### (1) *Lexington Herald–Leader*

■ The *Lexington Herald–Leader* started doing business with AD/SAT in 1987, when it entered into a five-year AD/SAT affiliation agreement. Under the terms of this agreement, the *Lexington Herald–Leader* paid a $7,500 affiliation fee, as well as a minimum usage charge of $12,500 each year. In the first years of its relationship with AD/SAT, the volume of ads transmitted via AD/SAT fell far below the paper's expectations. As a result, the *Herald–Leader* renegotiated its contract in 1989 to eliminate the $12,500 minimum usage fee. Nevertheless, the per-ad cost of the service remained extremely expensive for the paper. With the end of its contract approaching, the paper's national advertising manager prepared an analysis

of the service in late 1991. His report recommended that the contract be terminated. Formal notice of termination was sent in May of 1992. In response, AD/SAT offered to halve the affiliation fee, and the *Lexington Herald–Leader* decided to continue using AD/SAT's service. Nevertheless, the service remained extremely expensive on a per-ad basis. On June 10, 1994, the *Lexington Herald–Leader* terminated its relationship with AD/SAT.

Despite this history, AD/SAT maintains that the *Lexington Herald Leader* terminated its relationship with AD/SAT not because of economic concerns but, instead, as part of a concerted refusal to deal with AD/SAT. In support of this argument, AD/SAT cites several circumstances that it contends reveal that the *Lexington Herald–Leader* was not acting independently in refusing to deal with AD/SAT. First, it points to the timing of the *Lexington Herald–Leader*'s termination of its affiliation agreement with AD/SAT, which occurred approximately a month and a half after AdSEND was announced publicly. AD/SAT also points out that representatives of the *Lexington Herald–Leader* attended the NAA meeting where Newhouse purportedly invited newspaper executives to join in collective action to boycott AD/SAT. Finally, AD/SAT cites to a memorandum purporting to describe a conversation during which a representative of the Knight–Ridder group, the *Lexington Herald–Leader*'s parent company, pledged its support for AdSEND.

This evidence does not tend to exclude the possibility that the *Lexington Herald–Leader* acted independently. First, AD/SAT may not rely on the memorandum describing Knight–Ridder's pledge of support because it is inadmissible hearsay. *See Burlington Coat Factory,* 769 F.2d at 924 (noting that it is well-settled that a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment"). Furthermore, AD/SAT's other evidence demonstrates, at most, parallel conduct following an invitation to conspire.

Such evidence, without more, does not give rise to an inference of conspiracy. *See Apex Oil Co. v. DiMauro,* 822 F.2d 246, 253–54 (2d Cir.1987). Accordingly, summary judgment in favor of this defendant was appropriate.

### (2) *Oakland Press*

 Similarly, AD/SAT failed to adduce any evidence tending to show that the *Oakland Press* was not acting independently when it decided to terminate its affiliation agreement with AD/SAT. The *Oakland Press* signed an affiliation agreement with AD/SAT in October 1993; under the terms of that agreement, AD/SAT was required to install reception equipment at the paper's offices. The affiliation agreement also provided that either party could terminate the agreement without penalty if the other was in material default of its obligations under the agreement. During negotiations, Atkins, AD/SAT's then-president, promised to install the reception equipment within thirty days from the date of the agreement. And, in an October 20, 1993, letter to Alfred Derusha, the advertising director of the *Oakland Press,* Atkins said that AD/SAT would "get to work right away on installation of the equipment." Seven months later, in May 1994, the equipment still had not been installed, and AD/SAT informed the *Oakland Press* for the first time that the Macintosh interface it had promised to install was not available. At that point, Derusha wrote to AD/SAT, informing it that the *Oakland Press* was exercising its right to terminate the affiliation agreement because AD/SAT was in material default. AD/SAT responded that the *Oakland Press* had no right to terminate and that the equipment was being delivered.

AD/SAT contends that the *Oakland Press*'s stated reasons for its termination of the affiliation agreement were pretextual, and that the paper's real motivation was its desire to boycott AD/SAT and support AdSEND. This inference cannot reasonably be drawn from the evidence. At

the time the *Oakland Press* terminated its affiliation with AD/SAT, AdSEND was not even operational. The *Oakland Press* did not test AdSEND at its site until January of 1995, when an advertiser requested the service. Furthermore, AD/SAT has not produced any evidence tending to show that Derusha or anyone at the *Oakland Press* discussed the paper's relationship with AD/SAT with anyone from the AP or another paper. Finally, the facts belie AD/SAT's claim that the *Oakland Press* refused to deal with it; up to the time this action was commenced, the *Oakland Press* was attempting to negotiate a new affiliation agreement with AD/SAT. This conduct is clearly as consistent with legitimate business activity as with an unlawful conspiracy in restraint of trade. AD/SAT's claim against the *Oakland Press* cannot survive summary judgment.

### (3) *News & Observer*

 The *News & Observer* entered into its affiliation agreement with AD/SAT on August 15, 1986; in February 1993, the paper decided to temporarily unplug its AD/SAT recorder due to renovations at the paper that caused space constraints. After disconnecting the equipment, Richard Lee Henderson, the vice-president in charge of sales and marketing, noticed that the paper had received no complaints from advertisers regarding the unavailability of AD/SAT's delivery service. In the fall of 1993, Henderson learned that AD/SAT's corporate parent was filing for bankruptcy. Believing that this prospect was grounds for terminating the *News & Observer*'s affiliation agreement with AD/SAT, Henderson, advertising director James McClure, and W.L. "Mack" McCormick, the local sales manager, decided to terminate the agreement. This decision was communicated to AD/SAT by letter dated November 24, 1993.

AD/SAT's then-president, Atkins, told the paper that AD/SAT did not consider bankruptcy a valid grounds for termination under the contract; nevertheless, the paper reiterated its intention to exercise its right to terminate the agreement in a letter dated January 20, 1994. This letter was written five days after Lawrence Blasko of the AP visited the paper and introduced AdSEND. AD/SAT continued to contest the *News & Observer*'s right to terminate the affiliation agreement and, after consulting with its lawyers, the paper decided that paying the $7,500 annual affiliation fee would be less costly than a legal battle. Upon AD/SAT's insistence that the affiliation agreement so required, the paper re-installed the AD/SAT recorder at its offices.

AD/SAT points to the following facts in its attempt to implicate the *News & Observer* in the alleged conspiracies: (i) the paper's president, Frank Daniels, Jr., was chairman of the board of the AP during the development, approval, and implementation of AdSEND; (ii) five days after Blasko's visit, the paper reconfirmed its intention to terminate its relationship with AD/SAT; and (iii) during a conversation between AD/SAT president Hilton and Daniels on June 15, 1994, Daniels purportedly stated, "I don't think that we will be doing business together, we're a beta [test] site for Ad/Send."

Contrary to AD/SAT's arguments, this evidence does not support the inference that the *News & Observer* joined in a concerted refusal to deal with AD/SAT. Rather, the evidence shows that the paper—because it was dissatisfied with AD/SAT's service—expressed its desire to terminate its affiliation agreement well before anyone at the paper had heard of AdSEND and before the conspiracies alleged by AD/SAT supposedly came into existence. Furthermore, the outcome would be no different even if the paper had decided to terminate its AD/SAT affiliation after the paper's employees learned of AdSEND; the decision to terminate a service that was both costing the paper money and not bringing in additional revenue, and to install an alternative, cost-free service,

does not give rise to an inference of an unlawful conspiracy in restraint of trade.

The District Court properly granted summary judgment in favor of this defendant.

### (4) *DNI and CEI*

■ CEI and its subsidiary, Cox Newspapers, own over fifteen newspapers; of those papers, only four entered into affiliation agreements with AD/SAT. These include the *Dayton Daily News* (owned by DNI), the *Atlanta Journal/Constitution,* the *Palm Beach Post,* and the *Austin–American Statesman.* The *Atlanta Journal–Constitution* and the *Palm Beach Post* remained AD/SAT affiliates until AD/SAT ceased operations, and AD/SAT acknowledges that the *Austin–American Statesman*'s decision to terminate its agreement with AD/SAT was not the product of any conspiratorial agreement. However, AD/SAT does contend that the *Dayton Daily News*'s decision to terminate its relationship with AD/SAT in August of 1994 was the result of its participation in the alleged conspiracy to boycott AD/SAT and secure a monopoly position for AP's AdSEND.

In support of this argument, AD/SAT points to the following facts: (i) Cox's president, David Easterly, was a member of the *ad hoc* committee overseeing the AdSEND program for the AP; (ii) on June 16, 1994, AP officers met with Cox advertising executives and, at the conclusion of the meeting, Cathleen Coffey of Cox directed the Cox newspapers affiliated with AD/SAT to "review their contracts"; (iii) the *Dayton Daily News* gave AD/SAT notice of its intent to terminate its contract two months later, in August 1994; and (iv) notes taken by AD/SAT president Hilton indicate that the paper's advertising director, Pat Keil, told him that the paper's decision to use AdSEND was a corporate one.

This evidence does not tend to exclude the possibility that the *Dayton Daily News* was acting independently in terminating its relationship with AD/SAT. First, the record reveals that Keil, the person who made the decision not to renew the paper's affiliation agreement, did not attend the June 16 session on AdSEND. Furthermore, the fact that two Cox papers continued to use AD/SAT undermines AD/SAT's claim that the Cox papers made a corporate decision to boycott AD/SAT. Refusing to renew a contract that had proved very costly and opting to use a similar, free service is at least as consistent with a paper's legitimate business interests as with an unlawful conspiracy. Summary judgment in favor of the Cox defendants was appropriate.

### (5) *Daily Oklahoman*

■ The Oklahoma Publishing Company publishes the *Daily Oklahoman,* which entered into an affiliation agreement with AD/SAT in 1986. In 1993, the *Daily Oklahoman* received approximately 159 ads over the AD/SAT system; the affiliation and per-transmission fees resulted in a per-ad cost to the paper of approximately $68. That same year, the paper received approximately 400 ads over its own internal electronic "bulletin board." The *Daily Oklahoman*'s advertising department conducts an annual budget review each October. After the October 1993 review, the paper's advertising director, David Thompson, decided to terminate the paper's relationship with AD/SAT as a way to reduce operational costs. Thompson consulted with other members of the department to ascertain whether terminating the paper's AD/SAT service would harm operations; they reported it would not. On November 1, 1993, the *Daily Oklahoman* notified AD/SAT in writing that it was terminating its affiliation agreement with AD/SAT. AD/SAT did not respond to this notice of termination until September 28, 1994, when it wrote to the *Daily Oklahoman* asking it to reconsider its decision. There is no evidence that Thompson had even heard of the AdSEND program until several weeks after the AP's formal an-

nouncement of the program in April 1994—six months after the *Daily Oklahoman* terminated its relationship with AD/SAT.

Nevertheless, AD/SAT contends that the *Daily Oklahoman*'s decision was the product of its involvement in the alleged conspiracy to boycott AD/SAT. In support of this argument, AD/SAT points to the fact that in the summer and fall of 1994, the paper informed some of its larger advertisers that it had both terminated its relationship with AD/SAT and installed AdSEND at its offices. AD/SAT also contends that the paper's failure to renegotiate its agreement with AD/SAT is evidence of its involvement in the conspiracy. Finally, AD/SAT reports that one employee at the *Daily Oklahoman* told an AD/SAT executive that she would prefer that the paper stay on the AD/SAT network because of the speed of the service.

As the District Court ruled, none of these facts would allow a reasonable juror to conclude that the *Daily Oklahoman* was a member of a conspiracy to boycott AD/SAT. Antitrust law is not violated when a newspaper informs its advertisers that it has terminated its relationship with one delivery service and subsequently informs them that it has elected to use another service. The alleged statement of one employee who preferred AD/SAT is not sufficient to support an inference of conspiracy. Finally, the paper's refusal to renegotiate its contract with AD/SAT is not evidence of conspiratorial conduct, especially since AD/SAT's offer to renegotiate came more than ten months after the *Daily Oklahoman* terminated its relationship with AD/SAT and the offer did not include a marked reduction in cost. The grant of summary judgment in favor of the Oklahoma Publishing Co. was proper.

### (6) *Newark Star–Ledger* and *Birmingham News*

Advance Publications, Inc. owns, through subsidiaries, Newark Morning Ledger Co., which publishes the *Newark Star–Ledger*, and Birmingham News Company, which publishes the *Birmingham News*. AD/SAT's attempt to implicate these three companies—which are part of the Newhouse group—is also unsuccessful.

The *Star–Ledger* became AD/SAT's first affiliate in 1986. The paper is published in Newark, New Jersey, within close proximity of New York City's strong advertising base. Thus, although receiving some ads from overnight couriers and electronic delivery systems, the *Star–Ledger* also receives many of its ads via messenger services. While the prices paid for these services vary, all are substantially less expensive for the paper than receiving ads over AD/SAT's network. After receiving an invoice for the $7,500 annual affiliation fee in January 1993, Mark Herrick, the *Star–Ledger*'s director of marketing and advertising, decided not to pay the fee. In his deposition, Herrick stated that he felt the fee was too expensive and wanted to renegotiate with AD/SAT. In a meeting with AD/SAT representatives in August 1993, Herrick stated that he believed the service was too expensive, and asked that the affiliation agreement be renegotiated and the unpaid 1993 fee waived. In response, AD/SAT's then-president Atkins stated that AD/SAT intended to increase the *Star–Ledger*'s annual affiliation fee to $12,500.

At the same meeting, however, Atkins proposed a group discount for all the Newhouse newspapers. Herrick stated that he did not have the authority to consider such proposals but that he would pass the proposal on to his superiors. The proposal was ultimately rejected by the Newhouse group.

No further discussions took place until the summer of 1994, when Hilton and the new owners of AD/SAT realized that the *Star–Ledger* had not paid its 1993 or 1994 affiliation fees. After an exchange of letters, Herrick submitted proposed amendments to the affiliation agreement to Hilton on August 19, 1994. Herrick proposed

that the unpaid fees be forgiven, future affiliation fees be eliminated, and the notice period for termination be reduced from nine months to seven days. On December 28, 1994, after this lawsuit was filed, AD/SAT rejected the proposal and demanded that the outstanding fees be paid, but also promised to provide a new proposal to the paper in the near future. At the time the *Star–Ledger* filed its motion for summary judgment, no proposal had been made. The *Star–Ledger* eventually paid the outstanding fees and remained an AD/SAT affiliate until AD/SAT ceased operations.

 The only evidence AD/SAT offers to support its claim that the *Star–Ledger* was a member of the alleged conspiracy is that Newhouse, the president of the company that indirectly owns the *Star–Ledger*, knew about the AP's plan to enter the ad delivery business several months before Herrick's August 1993 meeting with AD/SAT representatives. AD/SAT contends that this fact explains why the *Star–Ledger* refused to deal with AD/SAT and why its group discount offer to the Newhouse papers was rejected.

This evidence does not give rise to an inference of a concerted refusal to deal on the part of the *Star–Ledger*. To the contrary, the evidence shows that the *Star–Ledger* sought not to terminate its relationship with AD/SAT, but rather to renegotiate the terms of that relationship. Although Herrick's refusal to pay the affiliation fees owed under the contract may have been an unreasonable negotiating tactic, it is not evidence of a conscious commitment to an unlawful scheme in restraint of trade. Moreover, even if the actions taken by Herrick had constituted a refusal to deal with AD/SAT, the paper had valid business reasons for ending its relation ship with AD/SAT because of the availability of other, more cost-effective means of receiving ads. The fact that Newhouse knew about the AP's plans to develop AdSEND before the August 1993 meeting does not tend to exclude the pos-

sibility that Herrick's decision on behalf of the *Star–Ledger* was an independent one. Indeed, AD/SAT has submitted no evidence tending to show that Herrick discussed his actions with Newhouse.

Nor can a concerted refusal to deal be inferred from the Newhouse papers' rejection of AD/SAT's group proposal; AD/SAT has not contradicted the evidence indicating that the Newhouse papers do not enter into such group arrangements. Furthermore, the allegation of a group boycott by the Newhouse papers is undermined by the fact that other Newhouse papers continued to use AD/SAT. Conspiracy claims cannot be based on speculation. The District Court properly granted summary judgment in favor of the Newark Morning Ledger Company.

 Likewise, the evidence pertaining to the Birmingham News Company, which publishes the *Birmingham News*, does not support the inference that this paper joined in an unlawful conspiracy in violation of the Sherman Act. In 1990, the *Birmingham News* entered into a five-year AD/SAT affiliation agreement. On April 11, 1994, AD/SAT sent the paper an invoice for its annual $10,000 affiliation fee. In the third or fourth week of May, Tom Lager, the director of sales and marketing at the *Birmingham News*, reviewed this invoice. Lager had joined the paper in January 1994 and was responsible for approving expenditures such as the affiliation fee.

Lager was familiar with AD/SAT because his former employer, the *Omaha World Herald*, had been affiliated with AD/SAT until Lager made the decision not to renew that paper's affiliation at the end of 1991. That decision was made after Lager and others at the *World Herald* reviewed the paper's level of usage in relation to the cost of the service and after Office Depot, the primary user of AD/SAT's delivery service, agreed to shift its deliveries to the *World Herald* to other carriers such as Federal Express. From

his earlier experience, Lager thought to check whether the *Birmingham News*'s use of AD/SAT justified its cost. A review of the log of ads received over AD/SAT revealed that the volume of ads delivered by AD/SAT was low and that most of the ads received via AD/SAT were from Office Depot. Concluding that the paper's continued affiliation with AD/SAT was not financially prudent, Lager consulted with his supervisor, Victor Hanson, who accepted Lager's recommendation not to renew the contract. On June 6, 1994, Lager sent a letter notifying AD/SAT that the *Birmingham News* would not be renewing its AD/SAT contract. Lager concedes that he had seen documents discussing AdSEND before he sent the termination letter.

In its appellate brief, AD/SAT asserts that Donald Newhouse's ownership of the paper and the paper's termination of its affiliation after the announcement of Ad-SEND give rise to the inference that the *Birmingham News* participated in the alleged conspiracies. As discussed above, the fact that Newhouse owned the newspaper, in the absence of any evidence tending to show that he was involved in its decision to terminate its AD/SAT affiliation, does not support an inference of conspiracy. Likewise, the fact that the paper terminated its relationship after the introduction of AdSEND does not give rise to an inference of concerted action. Rather, it shows, at best, parallel conduct following an invitation to conspire. Since the *Birmingham News*'s conduct was at least as—if not more—consistent with legitimate business concerns as with unlawful conspiracy, AD/SAT was required to submit evidence tending to exclude the possibility that the *Birmingham News* acted independently. Because it failed to do so, summary judgment was appropriate.[4]

### B. Donald Newhouse

■ AD/SAT alleges that Donald Newhouse—as a member of the AP board of directors and chairman of the NAA board of directors during the planning, approval, and implementation of AdSEND—was at the center of the alleged conspiracies to boycott AD/SAT and allow AdSEND to monopolize the ad delivery market. Though it is true that Newhouse, who is also the president and part owner of Advance, had the opportunity to join in a conspiracy with the AP to destroy competition in the ad delivery market, it is also true that, like the newspaper defendants, the NAA, and the NNN, Newhouse had no rational motive to do so. As both a newspaper owner and chairman of the NAA, a primary interest for Newhouse is making newspapers a more attractive medium for advertisers. As the District Court noted, "Encouraging and assisting AP in its effort to enter the delivery market is certainly consistent with this interest[,]" while "[j]oining a conspiracy to refuse to deal with AD/SAT in an effort to drive it out of business is not." *AD/SAT II*, 920 F.Supp. at 1316.

Furthermore, none of the evidence submitted by AD/SAT tends to exclude the possibility that Newhouse was acting in an independent effort to further the interests of his own newspapers and the organization he represented, the NAA. AD/SAT points to a letter, dated August 2, 1993, to AP president Louis Boccardi, in which Newhouse stated that the AP should move quickly if it planned to get into the ad delivery business because "there is a window of opportunity now which AdSat [*sic*] might close if too much time goes by." Far from demonstrating the existence of a conscious commitment to an unlawful scheme, this statement encourages competition by urging the AP to act quickly before AD/SAT forecloses competition. AD/SAT also asserts that Newhouse was instrumental in securing the NAA's exclusive support for AP's AdSEND. As dis-

---

4. In addition, summary judgment in favor of Advance was warranted since AD/SAT made no specific allegations against this defendant other than those levied against its president, Newhouse, and the newspaper publishing companies that it owns.

cussed below, the NAA never endorsed AdSEND to the exclusion of other firms involved in the electronic ad delivery market.

Nor is the fact that Newhouse introduced the AdSEND service to several major advertisers indicative of an unlawful conspiracy. With a position on the board of the AP and holding the view that Ad-SEND was a good product of general benefit to the newspaper industry, Newhouse had entirely legitimate reasons for promoting AdSEND. Moreover, "introducing a new competitor to a market's customers is conduct which the antitrust laws are designed to protect." *AD/SAT II,* 920 F.Supp. at 1317.

AD/SAT relies heavily on Newhouse's retirement speech at the April 1994 NAA convention, which it contends constituted an invitation to boycott AD/SAT and to assist AdSEND's effort to monopolize the market for ad delivery. In the speech, Newhouse encouraged NAA members to "work with the Associated Press and help our cooperative perfect its ability to transmit ads digitally from the advertisers' computer to our computer." Newhouse also stated that "NAA is working with the Associated Press as AP develops a computer to computer advertising transmission system which will . . . remove a barrier to the use of newspapers." Newhouse stressed the importance of "collective action" within the newspaper industry.

Newhouse's statements simply do not support the inference that AD/SAT proposes. Perhaps most telling is the fact that AD/SAT was never mentioned during the speech. AD/SAT's attempt to construe the statement, "We must not let our competitors have the advantage of creating the playing field and controlling the gateway," as a reference to AD/SAT is unavailing. The context of this statement strongly suggests that Newhouse was not referring to any deliverers of ads, much less AD/SAT in particular, but to the array of entities vying to develop new technologies to gather and deliver news.

In sum, the evidence provided by AD/SAT would not permit a reasonable juror to infer that the actions of Newhouse in support of the AP's development and marketing of AdSEND constituted participation in a concerted refusal to deal with AD/SAT in restraint of trade.

### C. NAA and NNN

■ Unlike the other defendants, the NAA and NNN are not direct participants in the advertising delivery business. Rather, the NAA was established with the goal of encouraging technological development in the newspaper industry in order to increase the profitability of newspapers; the NNN has the more specific goal of increasing the newspaper industry's declining share of advertising dollars. Thus, neither organization—as long as they were acting in accordance with these goals—had a rational motivation to join the conspiracies alleged by AD/SAT. Indeed, it would be counter to the goals of both organizations to eliminate a competitor in the market for delivery of ads in order to facilitate an attempt to monopolize the market by a newcomer that was not yet operational, especially since competition among delivery mechanisms would promote both technological innovation and fair pricing.

AD/SAT concedes that the NAA, after an initial meeting with AP executives in August 1993, made it clear that, while it would cooperate with the AP in its efforts to develop an electronic ad delivery system, it could not exclude other groups providing this service. Nevertheless, AD/SAT contends that the NAA reversed its position and, along with the NNN, began to boycott AD/SAT after certain meetings arranged by Newhouse between top AP executives and NAA president Cathie Black.

It is not seriously disputed that the NAA and NNN encouraged and assisted the AP when it was developing AdSEND. Indeed, after the AP's public announcement of AdSEND, these organizations al-

lowed the AP to give presentations about AdSEND at NNN regional meetings. Despite this, and other evidence of the NAA's and the NNN's encouragement, AD/SAT's claim against these defendants cannot survive summary judgment because AD/SAT has failed to submit evidence tending to show that the NAA and the NNN participated in an anticompetitive refusal to deal with it. To the contrary, the evidence reveals that the NAA and NNN continued to promote other electronic delivery services beyond AP's AdSEND, including AD/SAT itself. Furthermore, even if the NAA and NNN endorsed AP's service, a conspiracy could not be inferred from such an endorsement. *See Consolidated Metal Products, Inc. v. American Petroleum Institute*, 846 F.2d 284, 292 (5th Cir.1988) (holding that trade association's seal of approval for particular product, without constraining others to follow the recommendation, does not violate antitrust laws). Under these circumstances, summary judgment in favor of the NAA and NNN was appropriate.

Having ruled that summary judgment in favor of all other defendants with respect to AD/SAT's conspiracy claims was appropriate, we conclude that summary judgment in favor of the AP was also appropriate.

Conclusion

For the reasons stated above, the judgment of the District Court is affirmed.