In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 18-2725

SHARIF PHARMACY, INC.,

*Plaintiff-Appellant*,

*v.*

PRIME THERAPEUTICS, LLC,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-03464 — **Jorge L. Alonso**, *Judge*.

_____

No. 18-3003

HELEN J. SCALE, et al.,

*Plaintiffs-Appellants*,

*v.*

PRIME THERAPEUTICS, LLC, et al.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-06837 — **Robert W. Gettleman**, *Judge*.

_____

SUBMITTED OCTOBER 7, 2019 — DECIDED FEBRUARY 24, 2020[*]

_____

Before KANNE, HAMILTON, and BARRETT, *Circuit Judges*.

HAMILTON, *Circuit Judge*. The issue in these consolidated appeals is whether plaintiffs in two similar cases have stated viable claims under Sections 1 or 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. They have not. We affirm the judgments of both district courts dismissing the cases on the plaintiffs' pleadings, though in one case with slight modifications.

I.   *The Prime Network and the Plaintiffs*

Defendant Prime Therapeutics LLC is a pharmacy benefits manager. Plaintiffs Sharif Pharmacy, Inc. and J&S Community Pharmacy, Inc. were both members of the Prime pharmacy network. Under Medicare, Medicaid, and private health insurance plans, many patients had significant financial incentives to buy their prescription drugs from pharmacies within the network. Prime terminated both Sharif and J&S from the network after audits uncovered, in Prime's view, irregularities in invoicing for prescription drugs. Prime is owned in part by the insurer Blue Cross Blue Shield, and plaintiffs suggest that membership in the network is required in order for pharmacies in certain states to accept Blue Cross

_____

[*] These cases were scheduled for oral argument on September 18, 2019. On September 12, 2019, new counsel for plaintiffs in both cases moved to vacate oral argument and to have the cases submitted on the briefs. Two defendants opposed the motion; two others took no position. The panel vacated the oral argument and has concluded that the briefs presented the cases adequately under these circumstances. See Fed. R. App. P. 34(a)(2)(C).

Blue Shield, Medicare, and Medicaid prescription drug insurance plans. We assume, therefore, that termination from the Prime network hurt Sharif's and J&S's businesses.[1]

Sharif and J&S filed these suits alleging that their terminations from the Prime network violated the federal Sherman Act. Three customers joined the J&S action as plaintiffs who had to switch to different, less convenient pharmacies, at least for a time. In both cases, the plaintiffs alleged that the audits were pretextual and that Prime really terminated both pharmacies' participation in its network in an attempt to get rid of competition with Walgreens, with whom it had entered a joint venture in August 2016. Prime sent letters to both pharmacies' customers saying that Sharif and J&S would no longer accept their insurance and recommending that customers have their prescriptions filled at a nearby Walgreens. Prime also retained funds from both pharmacies as a result of the audits.

II.  *The J&S Suit*

The two cases took different paths through the district court and on appeal, presenting different issues. We begin with the J&S suit, which has been affected by events while the appeal has been pending. First, J&S itself obtained reinstatement in the Prime network. J&S then moved to dismiss its appeal voluntarily under Federal Rule of Appellate Procedure 42(b). We granted that motion, so J&S itself is no longer asserting any claims in the lawsuit. The reinstatement has also rendered moot the customer-plaintiffs' request for injunctive relief restoring J&S to the Prime network. See, e.g., *E.E.O.C. v.*

---

[1] For example, J&S alleged that more than 80 percent of its prescription-drug customers are insured by Medicare, Medicaid, or Blue Cross Blue Shield.

*Flambeau, Inc.*, 846 F.3d 941, 949–50 (7th Cir. 2017). We may not pass on the merits of "moot questions or abstract propositions." *Dorel Juvenile Group, Inc. v. DiMartinis*, 495 F.3d 500, 503 (7th Cir. 2007), citing *Calderon v. Moore*, 518 U.S. 149, 150 (1996).

That leaves only the customers' claims for damages in the J&S lawsuit. Those claims are not moot, but they cannot be remedied directly in federal antitrust litigation. It has long been recognized that the primary purpose of the federal antitrust laws is to protect the welfare of customers. E.g., *NCAA v. Board of Regents*, 468 U.S. 85, 107 (1984), citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979), quoting in turn Robert H. Bork, *The Antitrust Paradox: A Policy at War With Itself* 66 (1978); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 535–36 (7th Cir. 1986); *id.* at 585 (Easterbrook, J., dissenting). Perhaps ironically, however, it is well established under federal antitrust law's *Illinois Brick* doctrine that customers of parties more directly injured by an alleged antitrust violation do not have standing to assert their own claims for damages. See *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520–21 (2019) (applying *Illinois Brick* rules to section 2 claims for monopolization); *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); see also *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481–82 (7th Cir. 2002) (explaining *Illinois Brick* and its limits).

The Court explained in *Illinois Brick* that antitrust defendants are not permitted to argue that their direct victims were not injured because they were able to pass along price increases to their customers. 431 U.S. at 724–26, discussing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). *Illinois Brick* extended the same principle to bar claims by indirect purchasers (such as customers) even if they were

the ultimate victims of the violations. Because J&S Pharmacy would have been most directly affected by any alleged antitrust violation, its own customers may not bring their own claims for damages under the Sherman Act.

The customer plaintiffs alleged that they depended on J&S Community Pharmacy because it was the only pharmacy within walking distance that had accepted their insurance. During the time when J&S was excluded from the Prime pharmacy network, the customers were injured because they could no longer use it to fill their prescriptions and were "too poor or physically or mentally weak to regularly travel to a distant pharmacy for their medicine," "particularly during inclement weather."

We take these plaintiffs at their word, of course. We do not doubt that the exclusion of their familiar and most convenient pharmacy from their insurance coverage caused significant inconvenience and even hardship to them. Such harms, however, have not been treated as injury to "business or property" as required to recover damages under the Sherman Act, 15 U.S.C. § 15(a). Even if we assumed for the sake of argument that the exclusion of J&S Pharmacy from the Prime network might have violated the Sherman Act (though we reject Sharif's similar claims on the merits, below), its customers would not be entitled to sue for damages under that Act.

Courts and commentators have long been concerned with calibrating antitrust standing doctrine in order both to capture "the full cost of an antitrust violation … by looking to the injuries to all victims," and to ensure that "the defendant should not be made to pay twice for the very same injury." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 339a (4th

ed. 2019). Here, the relief sought by the customer-plaintiffs would duplicate any relief that J&S could have sought on its own behalf. Their claims are barred because they would "substantially increase[] the possibility of inconsistent adjudications [ ]and therefore of unwarranted multiple liability for the defendant[.]" *Illinois Brick*, 431 U.S. at 730.[2]

III. *The Sharif Pharmacy Suit*

Although we affirm the dismissal of the J&S suit for reasons unrelated to the merit or lack of merit of the allegations of Sherman Act violations, the Sharif Pharmacy appeal presents the merits squarely. Sharif alleges in essence that Prime Therapeutics and Walgreens have created a joint venture that encourages patients insured through Prime to buy their prescription drugs at Walgreens and not at other competing retail pharmacies like Sharif. The allegations fail to state a viable claim under either Section 1 or Section 2 of the Sherman Act, so we affirm.

In antitrust parlance, Sharif alleges a variant on a claim for exclusive dealing and/or a refusal to deal. Sharif alleges in effect that Prime prefers to deal with Walgreens rather than Sharif. Sharif has not alleged a horizontal agreement (i.e., among competitors) to fix prices or divide markets, so the case is not subject to the rule of per se illegality under Section 1 of the Sherman Act. Under the rule of reason for Section 1 cases, exclusive dealing or refusals to deal could violate Section 1 only if a defendant has monopoly or market power in a relevant

---

[2] Given our holdings here as to mootness and antitrust standing, we have considered but see no need to reach the arguments raised by the State of Illinois under the Eleventh Amendment and the Sherman Act state action immunity doctrine.

market. See generally, e.g., *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–87 (2007) (summarizing per se illegality and rule of reason).

Section 2 of the Sherman Act prohibits monopolization and attempts to monopolize, but with narrow exceptions it allows even firms with monopoly power to choose with whom they deal and on what terms and conditions. Even monopolists "are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 555 U.S. 438, 448 (2009), citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

There are "limited circumstances" under which a monopolist's refusal to deal *with a competitor* will be illegal anticompetitive conduct. *Id.*; see generally *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985); Areeda & Hovenkamp, *Antitrust Law* ¶ 1800c5 ("Section 2 of the Sherman Act reaches unilateral refusals to deal when the refusals constitute monopolization … ."). To begin even to try to fit this case into these relatively narrow exceptions, Sharif would need to allege that Prime and/or Walgreens either have or are dangerously likely to obtain monopoly power in a relevant market.

So, in the absence of an alleged per se violation of Section 1, Sharif's federal claims require it to identify a relevant product and geographic market in which Prime and/or Walgreens have or were dangerously likely to obtain monopoly power. Even at the pleading stage, it is sufficiently clear that Sharif cannot identify an appropriate geographic market where a defendant had or threatened to have monopoly power.

A "relevant market" under the Sherman Act is comprised of the "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). "A properly defined market excludes other potential suppliers (1) whose product is too different (product dimension) or too far away (geographic dimension) and (2) who are not likely to shift promptly to offer defendant's customers a suitably proximate (in both product and geographic terms) alternative." Areeda & Hovenkamp, *Antitrust Law* ¶ 530a.

*Geographic Market*: Sharif has not plausibly alleged that either Prime or Walgreens has or threatens to gain monopoly power in a relevant geographic market. In its proposed second amended complaint, Sharif identified three areas that might serve as relevant geographic markets. In the section entitled "The Geographic Market," Sharif alleges that the relevant market in this case is "nation-wide for Prime and Walgreens." Sharif argues, quoting a Dow Jones wire article, that Prime and Walgreens were joining forces to give Walgreens "more muscle to compete against CVS Health's integrated model that combines a retail pharmacy chain with a large PBM [pharmacy benefits manager]." The proposed complaint construes this news coverage as "a public admission by Defendants that through their partnership, and the scheme Plaintiff alleges above where Prime terminates pharmacies' ability to sell prescription drugs, they will violate antitrust laws nation-wide to increase their market share of prescription drugs." Elsewhere in the proposed complaint, Sharif asserts that "the five-block area" surrounding its pharmacy and "the Chicago market area" are geographic regions in which Prime is seeking to terminate the network participation of possible Walgreens competitors.

The United States as a whole and the Chicago metropolitan area are plausible geographic markets for retail prescription drug sales, but we see no plausible allegation that Prime and/or Walgreens have or threaten to gain monopoly power in a nationwide or metropolitan Chicago market for retail prescription drug sales. Plaintiff's assertion that the defendants merely sought to increase their market shares does not come close to satisfying the requirement of actual or threatened monopoly power. Antitrust law assumes that all competitors seek to increase their respective market shares, especially by business arrangements that will offer more attractive products and services to their customers.

Sharif's assertion that the five-block radius around its location is a relevant market is not plausible. The antitrust statutes require a "pragmatic" and "factual" approach to defining the geographic market. *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 336 (1962). The market must "correspond to the commercial realities of the industry." *Id.*, quoted in *Federal Trade Comm'n v. Advocate Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016) (quotations omitted). Where geographic convenience is important to consumers, retail markets can be small, see *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 358 (1963), but not this small. It defies belief to suggest that a hypothetical monopolist retail pharmacy could raise its drug prices substantially without losing customers to competitors outside that tiny area. See also *42nd Parallel North v. E Street Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002) (rejecting as "absurdly small" a proposed market for retail designer jeans and tee-shirts comprising only the "central business district" of Highland Park, Illinois).

*Product Market*: Though we could affirm the judgment of
the district court solely on the basis of our geographic market
analysis, for two reasons, we also address plaintiffs' failure to
plead a proper product market. First, though its discussion
was brief, the district court did address the issue, and its anal-
ysis would have been sufficient to support its decision. Sec-
ond, Prime Therapeutics has taken an aggressive position on
appeal: that "claiming a market of all 'prescription drugs' is
meaningless" and that "attempting to measure the inter-
changeability of countless unnamed 'prescription drugs' is an
impossible task." Sharif has not pleaded facts sufficient to
support an inference that defendants have the requisite mar-
ket power within a viable product market for retail prescrip-
tion drugs. Sharif's failure, however, does not mean that no
future antitrust plaintiff may be able to do so.

"The outer boundaries of a product market are deter-
mined by the reasonable interchangeability of use or the
cross-elasticity of demand between the product itself and sub-
stitutes for it." *Brown Shoe*, 370 U.S. at 325. Sharif asserts that
the relevant product market is retail prescription drugs. De-
fendants contend that this product market is not plausible be-
cause more than 39,000 prescription drugs are sold in the
United States, and of course one prescription drug may be in-
terchangeable with only a few or perhaps no others. Contrary
to the defense arguments, however, and subject to appropri-
ate proof, we see no necessarily fatal flaw in treating that bun-
dle or cluster of prescription drugs that are typically sold in
brick-and-mortar retail pharmacies as a relevant product mar-
ket.

A cluster of products can comprise a relevant product
market "if the cluster is itself an object of consumer demand."

*Advocate Health Care Network*, 841 F.3d at 467 (quotations omitted). As the Tenth Circuit noted in *Green Country Food Market, Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1283–85 (10th Cir. 2004), the Supreme Court has recognized such "cluster" markets in banking, see *United States v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 360–61 (1970); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 356–57 (1963), and central-station home security products, see *United States v. Grinnell Corp.*, 384 U.S. 563, 572–73 (1966). The Court said in *Grinnell Corp.* that "We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities."

Health care services can be suitable subjects for such "cluster" product markets. In *Advocate Health Care Network*, we recognized "inpatient general acute care services—specifically, those services sold to commercial health plans and their members" as a product market, including those "medical services and procedures that require admission to a hospital, such as abdominal surgeries, childbirth, treatment of serious infections, and some emergency care." 841 F.3d at 468. See also, e.g., *Messner v. Northshore University HealthSystem*, 669 F.3d 802 (7th Cir. 2012) (recognizing bundled hospital services as product market); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 n.2 (7th Cir. 1989) (retail supermarkets defined relevant product market); see generally *Grinnell Corp.*, 384 U.S. at 572–73 & n.6 (commercial realities showed that central-station alarm companies needed to offer all or nearly all types of property-protection services, making cluster of services a relevant product market); Areeda & Hovenkamp, ¶ 565c (recognizing that surgical services might be appropriate "cluster" product market, but criticizing other attempts to establish cluster product markets).

We close with a note about resolving these appeals on the pleadings, with the federal claims dismissed with prejudice. Since federal civil pleading standards changed so dramatically in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), it has been especially important for district courts to give leave freely to amend pleadings. E.g., *Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015) (collecting cases). Uncertainty about application of the *Twombly-Iqbal* standard means that a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should ordinarily be given at least one opportunity to try to amend its complaint before the action itself is dismissed with prejudice. *Id*. In these cases, however, it is apparent that the federal antitrust claims are based on misunderstandings about foundational principles of antitrust law. It is evident from the proceedings in the district courts and the arguments in plaintiffs' appellate briefs that the defects in these cases cannot be corrected, so that further amendment would be futile. E.g., *Runnion*, 786 F.3d at 520; *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 666–67 (7th Cir. 2007). The district courts thus did not err in dismissing these federal antitrust claims with prejudice.

*   *   *   *   *

The judgment of the district court in the J&S Pharmacy case dismissing the Sherman Act claims of J&S customers Scale, Thomas, and Brown with prejudice is AFFIRMED as to plaintiffs' damage claims; dismissal of those plaintiffs' claims for injunctive relief is AFFIRMED AS MODIFIED to dismiss those claims as moot; and dismissal of those plaintiffs' state-law claims without prejudice is also AFFIRMED. In the Sharif

Pharmacy case, the dismissal of the Sherman Act claims with prejudice and dismissal of the state-law claims without prejudice are AFFIRMED.